IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RAMONA BOSWELL,

                        Plaintiff,                                    OPINION AND ORDER

    v.                                                                        17-cv-706-wmc

WISCONSIN DEPARTMENT OF
ADMINISTRATION and DAWN M. SOLETSKI,

                        Defendants.

Plaintiff Ramona Boswell, who is black, alleges that the Wisconsin Department of Administration and a former supervisor subjected her to a hostile work environment and discrimination based on her race, then further retaliated after she filed an ERD complaint alleging race discrimination. Defendants have moved for summary judgment on "all claims," while focusing their arguments on plaintiff's allegation of race discrimination and retaliation. In response, plaintiff has abandoned her retaliation claim and does not reference her hostile work environment claim. For the reasons set forth below, defendants' motion for summary judgment will be granted.

UNDISPUTED FACTS[1]

A. Background

The Department of Administration is charged with aiding the Wisconsin Governor

---

[1] Except where noted, the following facts are material and undisputed for purposes of summary judgment, viewing the facts in the light most favorable to plaintiff as the non-moving party. The court reminds litigants that disputing a proposed finding of fact requires "stat[ing] your version of the fact and refer[ing] to evidence that supports that version." (Preliminary Pretrial Packet (at dkt. #11) 5.) Simply identifying a dispute or an unexplained "[o]bjection" is not enough.

in developing and implementing the state budget, as well as assisting other state agencies with financial management and centralized purchasing. Ramona Boswell, née Schuch, is a 55-year-old African American woman with an associate's degree in business management. She has worked for the Department since November 20, 2000, as a financial specialist 2, 3, or senior, and she currently holds the position of financial senior advanced. Since approximately 2009, Boswell has been eligible for and taken advantage of a flexible schedule, which allows her to work ten hours a day, four days a week, with Fridays off. Accordingly, she works 6:30 a.m. until 5:00 p.m. on Mondays and Wednesdays and 7:00 a.m. until 5:30 p.m. on Tuesdays and Thursdays. She is the only employee in her unit with this flexible schedule.

Over the course of Boswell's employment, she has had a number of supervisors, including financial program supervisor Christine Fischer, who was responsible for supervising the Accounts Payable and Accounts Receivable departments until she retired on May 6, 2011. The Bureau of Financial Management ("BFM") is part of the Accounts Payable department. At times, Boswell has been the only African American in her unit. As a result of Fischer's retirement, defendant Dawn Soletski became the financial program supervisor above Boswell on June 6, 2011.

For the ten years between 2004 and 2014, Boswell generally met her employer's expectations. Fischer completed Boswell's evaluations from 2004-2010, while Soletski completed the evaluations from 2011-2014. Boswell's 2012 and 2013 evaluations described her overall performance as "meet[ing] standards," while the 2014 evaluation described her performance as "effective."

**B. November 6, 2014, Letter of Instruction**

On November 6, 2014, Soletski issued a "letter of instruction" to Boswell. The letter addressed concerns about "personal use of the telephone; unexplained absences from [her] work area during the workday; and not responding to emails in a timely manner," as well as "falling asleep at [her] desk during work hours." (Nov. 6, 2014 Letter (dkt. #26-5) 1.) The letter also laid out eight "procedures and expectations" for Boswell going forward:

1) "adhere to [her] assigned flex schedule, arriving at 7:00 a.m. and ending at 5:30 p.m. Monday through Thursday";

2) submit of written requests for vacation time "three business days prior to the requested date," with the requests considered based on the unit's work needs;

3) keep personal phone calls "to a minimum" and typically only during non-work time;

4) inform her supervisor about where she would be and with whom she was meeting if she was to be away from her desk for more than ten minutes;

5) respond to email within one business day in a professional manner;

6) "[n]o sleeping at [her] desk or at meetings";

7) call her supervisor and another staff member before her start time if unable to come in; and

8) limit "[a]ctivities such as eating meals at [her] desk while working, time spent in the kitchenette preparing and cleaning up after meals, and personal conversations" to breaks or lunch.

(*Id.*) This letter was *not* accompanied by a notice of suspension, reduction of hours, or decrease in pay, nor has there been any such adverse job action taken against Boswell since.

Defendants acknowledge that the eight procedures and expectations set forth in the letter were unique to Boswell, but represent that the reasons for issuing the letter were as

follows:

Scheduling:  Soletski noticed a number of instances where Boswell arrived at work late, without calling before her scheduled start time.  Soletski contends that the attendance policy required employees to arrive on-time and to provide notice before their start time if they were going to be late.  However, Boswell testified that she was the *only* employee who was required to call in half an hour before her scheduled start time or ask for time off three days in advance.  (Boswell Dep. (dkt. #21) 53:21-55:3.)  She further contends that other employees could come and go as they pleased and were not required to call in half an hour before their start times.  (*Id.* 100:25-101:19.)  For example, Diane Berenz, another employee reporting to Soletski, was not disciplined for calling in nineteen minutes into her scheduled work time saying that she would be an hour late before arriving three hours into her shift on September 9, 2015.[2]  Soletski also did not discipline another employee who called in late on September 15, 2015, and then arrived late two days later.[3]  Reportedly, this employee called in late half as often as Boswell, but Soletski had not investigated or recommended discipline against Butts.  Further, Boswell contends that by 2015, Soletski began inspecting her sign-in log entries, but not the entries of her white colleagues.

Phone Use:  Soletski witnessed Boswell using her cell phone before issuing the November 6 letter, but cannot specify how often.  Moreover, there was no rule prohibiting employees from bringing their cell phones to work; likewise, Soletski was unaware of any

---

[2] The parties agree that Berenz's first name is Diane, while the deposition testimony reveals some confusion about whether it is Diane or Diana.

[3] Soletski could not recall whether this employee was Nancy Butts or Nancy Stout.

rule limiting employees from using their cell phones. Indeed, other employees, including Soletski, used their cell phones at work. Nevertheless, Soletski monitored Boswell's phone use after the November 6 letter. This monitoring showed that Boswell placed minimal calls from her phone. Soletski did *not* track other employees' personal phone use, nor did she address the appropriateness of personal phone use with other employees. Soletski also did not limit Boswell's colleagues' use of their phones. Nevertheless, Boswell contends that Suzanne Oakey, the colleague she sat across from, was "constantly" on her cell phone with her children and grandchildren. (Boswell Dep. (dkt. #21) 92:25-93:9.)

Absence from Work Station: Before issuing the November 6 letter, Soletski had already spoken to Boswell about absences from her work station. When Soletski asked Boswell about being away, Boswell "explained that she had meetings with other customers. And [they] talked about how [they] wanted to approach that, which is [to] schedule the meetings on [Boswell's] calendar or use that white board at the end of the aisle to identify that [she was] having a meeting on the eighth floor." (Soletski Dep. (dkt. #30) 93:19-94:4.) Boswell and her colleagues worked with customers throughout the building and out of state. There were no rules or written policy about when employees could go talk to people in other locations in the building, nor when employees needed to notify their supervisors about leaving their work stations. Soletski could not explain how she kept track of Boswell's absences from her work area, nor could she specify how many times Boswell was away from her work area. Soletski did not require other employees to inform their supervisors when they were going to be away from their desks for more than 10 minutes.

<u>Responding to Email:</u>  While Soletski contends that Boswell failed to respond to emails, she cannot specify how many emails went unanswered.  In particular, Soletski did not keep copies of unanswered emails leading to the November 6 letter, nor does she recall ever showing Boswell those unanswered emails.   Soletski also did not circulate requirements of responding to emails in a professional manner within one business day to other employees.

<u>Sleeping at Work:</u>  Soletski contends that she found Boswell facing her computer with headphones in, arms crossed, asleep on October 28, 2014.  Soletski does not recall a second time that she found Boswell asleep at work, but believes someone reported a second occurrence.  She does not remember the details of that report.  Soletski acknowledged that no rule prohibits employees form closing their eyes at work.

### C.  Events and Aftermath of December 3, 2014, Incident[4]

Following her retirement, Fischer returned to the BFM as a limited-term employee in 2014 in the same unit as Boswell, but no longer as her supervisor.  Early on the morning of December 3, 2014, Boswell avers that Fischer spoke to her at her desk and loudly told her that she was tired of her making mistakes.  In response, Boswell said "whatever," put her headphones in her ears, and turned away from Fischer.  At that point, Boswell claims Fischer grabbed her left wrist, twisting her back around.  After Boswell told her to stop and to remove her hand, Fischer then apologized.

---

[4] Many of the parties' proposed facts relate to this event.  However, in light of plaintiff's voluntary abandonment of her retaliation claim, it is unclear how material or even relevant this event is.  The court, however, includes these facts as they are the sole basis of plaintiff's ERD charge, and in plaintiff's view demarcate the decline in her performance reviews.

Boswell informed management and requested that action be taken against Fischer for this "assault." She then made an appointment with a doctor through urgent care for 11 a.m.[5] During her visit to urgent care, Boswell's wrist was x-rayed, and she was advised to take Tylenol for pain. Boswell's wrist was also bandaged for approximately one week, but she did not miss work because of her injury.

After learning about the incident, Jim Langdon, the division administrator and Fischer's supervisor, sent Fischer home without pay for the rest of the day. The next day, he met with Boswell, Fischer, Soletski, and Lisa Dally, a representative from human resources, to discuss how best to address what happened between Fischer and Boswell. Despite providing paperwork from her doctor, Boswell maintains that Langdon criticized her for saying that Fischer "attacked" her, characterizing it instead as a "touch." (Boswell Dep. (dkt. #21) 42:19-43:6.) Fischer again apologized to Boswell at the meeting, although Boswell did not respond. Instead, Boswell reported that she was uncomfortable working with Fischer. While those in attendance agreed that Boswell and Fischer did not need to work together, and they were instructed not to interact, Boswell contends that no one at the meeting admonished Fischer. (*Id.* at 99:9-14.) Still, Fischer resigned from her part-time employment with the Department on that same day, December 4, 2014, and she has not worked there since.[6]

---

[5] The parties seem to agree this characterization meant Boswell "rush[ed] to the emergency room." (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #38) ¶ 75.)

[6] Boswell also point out that Soletski did not discipline Fischer for her actions on December 3, even though workplace policy prohibited unconsented physical contact. Given Fisher's resignation the very next day, the import of this fact is questionable.

During the December 4th meeting, Boswell did not allege that the incident the previous day was racially discriminatory, but near the conclusion of the meeting, she did ask how the situation would have been handled if the roles had been reversed. Langdon told her that the incident would have been handled the same way, except that Boswell would have been sent home *with* pay because she was a full-time employee. Boswell did not and does not agree with his assessment, and Soletski understood Boswell to have implied that Fischer was treated more favorably because of her race.

Neither following the incident on December 3rd, nor during the December 4th meeting, did Boswell ask for the Capitol Police to be called. Nevertheless, Boswell contends that the police should have been called on the day of the original incident, given that the employee handbook provides that "[i]f an employee sees a crime in progress or observes a violent confrontation, they should contact the Capitol Police emergency number 608-266-7700 immediately." (Handbook (dkt. #34-6) 68.) On January 15, 2015, Boswell finally contacted Capitol Police herself about the December 3 incident. Following an investigation and referral for possible prosecution, however, the Dane County District Attorney declined to prosecute Fischer.

Boswell contends that "since her incident with Chris Fischer [on December 3, 2014], her performance evaluations have been below average. Due to below average performance evaluations, Boswell has never received a discretionary merit raise."[7] (*See e.g.*,

---

[7] Plaintiff contends that "there are only 3 black people in the last 20 years who have received a discretionary merit raise," but she does not put forward any evidentiary support for this assertion. Rather, she points to her deposition testimony in which she alleges that she gleaned that knowledge from "the website," which is an "open record." (*See* Boswell Dep. (dkt. #21) 64:15-65:19.)

Pl.'s Resp. to Defs.' PFOF (dkt. #37) ¶ 12.)  Boswell alleges that she received letters of instruction or reprimands since 2011-2012, but that her colleagues did not receive any.[8] (*See* Soletski Dep. (dkt. #30) 45:3-12 (agreeing that Boswell was the only employee investigated for work rule violations).)

### D. December 8, 2014, Letter of Reprimand

On December 8, 2014, Soletski issued Boswell a letter of reprimand for missing a meeting about invoices for WIN e-Gov Portal Vendor on November 17, 2014, at 10 a.m. Employees were required to attend business meetings relevant to their work duties. Soletski contends that Boswell removed the meeting from her Outlook calendar after they discussed her missing the meeting.

Later, Soletski and Boswell met about the letter of reprimand.  Boswell explained that she had been working with a vendor at the time of the November 17 meeting, and she actually had two meetings to attend.  She also claimed to have misread her calendar, believing that the WIN meeting was scheduled for 4 p.m., instead of 10 a.m.  Soletski responded by noting that Boswell had accepted the meeting invitation for 10 a.m., and she offered Boswell Outlook training and other ideas to assist Boswell with Outlook.

While Boswell acknowledges not accepting this offer, she contends that her colleagues also miss, arrive late to, or leave meetings early:

> Sam, he starts at 8:30, but he can't -- he couldn't get to work
> at 8:30.  So we have a 9:00 meeting.  He comes in at 9:30.

---

[8] While defendant objects that plaintiff lacks personal knowledge of all other coworkers during this time period, the court will presume for purposes of summary judgment that plaintiff could lay an appropriate foundation to establish that she did have personal knowledge, unless there is reason to doubt that personal knowledge.

> Ross goes Oh, that's okay.  Sam is always running late.  Never
> once was he written up for being late.
> Paulina, if we have a meeting, she says I'm not staying.  I leave
> at 3:30.  She leaves the meeting.  Denise, she comes into
> meetings late all the time.

(*See* Boswell Dep. (dkt. #21) 96:20-97:14.)


## E.  ERD Complaint

In July 2015, Boswell filed an ERD complaint about the December 3rd incident, in

which she alleged race discrimination.  She alleged that if the situation with Fischer had

been "the other way around (if [Boswell] had attacked a white co-worker and she had to

go to urgent care for injuries), [she] would have been suspended, escorted out of the

building by Capitol Police, and later fired."  (ERD Compl. (dkt. #34-4) 2.)


## F.  Additional Incidents

On October 14, 2015, Boswell did not advise that she was going to be late to work

in a timely fashion.  When asked what happened, she provided inconsistent answers.

Defendants contend that Boswell "claimed she could not call in earlier because she did not

have her cell phone," but that she had, in fact, called from her cell phone.  Boswell

acknowledges that she used her cell phone, but contends that she told Soletski that she

had used her neighbor's phone.  Boswell also testified that she had overslept, adding that

she called in at 6:20 a.m., ten minutes before her start time.  (Boswell Dep. (dkt. #21)

53:2-25.)

At a staff meeting on November 19, 2015, Soletski observed Boswell sitting with

her eyes closed.  Boswell opened her eyes and confirmed that she was tracking the meeting

when asked, but then closed her eyes for extended periods of time. Boswell was diagnosed with allergic conjunctivitis, which makes her eyes itchy, dry and feel like they're burning. Closing her eyes helps relieve her symptoms. She does not fall asleep when she closes her eyes. Defendants do not dispute her diagnosis, but note that Boswell has alleged that she closes her eyes because of sleep apnea. (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #38) ¶ 52.)

Soletski issued a reprimand letter to Boswell on December 10, 2015, for the October 14 occurrence. The letter identifies three reasons for the reprimand: (1) insubordination; (2) neglect of responsibilities; and (3) failure to accurately provide information. (Dec. 10, 2015 Letter (dkt. #26-10) 1.) The letter explained that Boswell "failed to report to work on a timely basis, failed to call in to work prior to [her] starting time, and failed to email [her] supervisor when [she] arrived." (*Id.*) Boswell contends she was the *only* employee required to call in half an hour before her start time if running late.

On February 1, 2016, Boswell again did not come into work and had not been approved for leave time, although she asked a colleague to mark her as "out" on the office whiteboard. After Soletski informed Wil Mickelson of this absence, he suggested an investigation. While investigatory interview notices were not ultimately circulated because Boswell provided an explanation, Soletski issued a letter of instruction on February 25. The letter explained that "on February 1, 2016, you failed to call into work prior to your start time when you were going to be absent, and you did not call your supervisor regarding your absence. This is in direct violation of the written directive given to you on November 6, 2014." (Feb. 25, 2016 Letter (dkt. #26-11) 1.) It noted the Department had a "business need to know when employees will be absent" and instructed her to "call in to

[her] supervisor before [her] start time" if she was unable to come into work.  (*Id.*)

## G. New Supervisor

On June 26, 2016, Soletski ceased to be Boswell's supervisor.  Instead, Controller Ross Behrend is now responsible for supervising the accounting section, including the audit reporting and general accounting units, which makes him Boswell's direct supervisor.  Since taking over supervising responsibility, Behrend reports that he has not enforced the expectations outlined in Soletski's November 6, 2014, letter of instruction, based on his understanding that they were not to be enforced after one year of issuance.  Nevertheless, Boswell contends that:  (1) they still apply; (2) she has not been informed that they are no longer enforced; and (3) Behrend closely monitors what she does in the computer system, which prevents her from correcting errors by directing a colleague to intervene.  She also contends that Behrend curses at and criticizes her in front of colleagues.[9]  The parties dispute whether Behrend treats other financial specialist senior employees differently than Boswell, although they agree that check processing and other work were taken away from

---

[9] As noted previously, the court presumes at summary judgment that an appropriate foundation for sworn testimony could be given, unless there is good reason to doubt that.  At this point, the court will assume that Boswell could lay a foundation to establish her personal knowledge regarding Behrend tracking her computer usage, but it will not presume she can establish that he regularly goes through her garbage on Fridays because:  (1) she is not at work on Fridays; and (2) her assertion that a colleague "told" her what Behrend does when she is not present is obviously inadmissible hearsay.  (*See* Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #38) ¶ 96.)  That said, Behrend himself acknowledges searching Boswell's recycling bin outside of her presence, which is obviously admissible evidence.

Boswell and given to her white colleague, Sue Kennedy.[10]

Behrend first formal evaluation of Boswell's work performance was for the period from July 1, 2015, through June 30, 2016. Boswell's overall rating on this evaluation was "Improvement Needed." (2016 Evaluation (dkt. #25-1) 4.) In the evaluation, Behrend noted that: (1) Boswell's pre-audit and data entry work were not as accurate as required by her position; and (2) she had failed to become proficient in internal business processes. (*Id.* at 3.) Boswell disputes the accuracy of that assessment. As context, on October 1, 2015, the Department implemented the STAR ERP system for certain groups. Behrend contends that Boswell did not gain as much familiarity with this new system as expected. In contrast, Boswell contends that she is familiar with the system and disputes difficulty learning it. The parties also dispute whether Boswell understands the internal business process for budget check errors. (Defs.' Reply to Pl.'s Resp. to Defs.' PFOF (dkt. #39) ¶ 55.)[11]

Behrend evaluated Boswell's performance a second time for the period of July 1, 2016, to October 31, 2017, finding that her performance had improved over the prior year in some areas, and rating her overall performance as "effective." Notwithstanding

---

[10] In response to this proposed fact, defendants state cryptically that "[t]his fact should be disputed or not disputed." (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #38) ¶ 94.) As defendants apparently cannot make up their minds, the court will consider this fact undisputed for purposes of summary judgment.

[11] The parties appear to agree that the business process requires budget check errors to first be communicated to an accountant to make sure the correct funds are being used. Once established that the correct funding string was being charged, the accountant would coordinate with the relevant budget analyst to clear the errors and process payment. While defendants contend that Boswell "continually bypassed accountants" to "work[] directly with the budget analysts to resolve the budget check errors." Plaintiff disputes this. (*Id.* at ¶ 56.)

Behrend's overall assessment of Boswell, he noted that while she focused on processing invoices effectively, she still made some errors. Behrend's main concern with Boswell's performance was communication. Specifically, her evaluation notes that she "is often non-responsive or lacks timeliness in her response to email communications." (2017 Evaluation (dkt. #25-2) 1.) Boswell disputes this. Behrend also encouraged Boswell to participate more appropriately in staff meetings. (*See id.*) Boswell contends that she no longer speaks in meetings because she does not want to be degraded by Behrend.

OPINION[12]

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, evidence is viewed "in the light most

---

[12] Defendants argue that plaintiff's Title VII claims are limited to those before her July 2015 ERD filing -- specifically, complaints about the November 2014 letter of instruction and her December 2014 reprimand. (Defs.' Opening Br. (dkt. #29) 11; Reply (dkt. #40) 2.) Plaintiff contends that defendants' argument "ignores that there is also a §1983 [claim] that encompasses the entire time period from when the discrimination began in late 2014 onward," so that "the jury will not be asked to differentiate between the [Title VII and § 1983] claims." (Opp'n (dkt. #33) 33.) Plaintiff's argument itself ignores that she is only alleging her § 1983 claim against defendant Soletski. (Amend. Compl. (dkt. #29) ¶ 1.) Assuming that plaintiff's ERD complaint sufficiently alleged racial discrimination and a hostile work environment for other than the seemingly unrelated incident on December 3, 2014 -- which the court is fairly convinced it does not -- plaintiff did not have to file an additional charge detailing behavior post-dating her July 2015 filing. *See Little v. Ill. Dept. of Pub. Health*, Case No. 16-CV-10377, 2017 WL 5903835, at *3 (N.D. Ill. Nov. 30, 2017) ("courts have allowed Title VII claims to proceed where the plaintiff's allegations included conduct that occurred after the plaintiff filed an EEOC charge, as long as those later actions were part of a continuing pattern of mistreatment involving similar types of conduct and the same individuals," but that "courts have rejected claims where the allegedly discriminatory conduct that occurred after the plaintiff filed an EEOC charge was separate and distinct from the conduct described in the EEOC charge"). Given that defendants do not argue otherwise and any defect is not jurisdictional, however, the court need not draw a line in the sand at the date of plaintiff's filing of her ERD complaint.

favorable to the non-moving party," but the "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (citing *Abdullahi v. City of Madison*, 423 F.3d 763, 769, 773 (7th Cir. 2005)).

Here, plaintiff has alleged that defendants have: (1) "subjected her to a hostile racial harassment work environment"; and (2) "discriminated against Plaintiff with respect to work conditions." (Amend. Compl. (dkt. #16) ¶ 1.)  At summary judgment, however, the parties limit their briefing to the now abandoned retaliation claim and plaintiff's claim of race discrimination -- even though defendants sought judgment on "all claims" (Defs.' Opening Br. (dkt. #29) 3).  Accordingly, the court will follow suit and address plaintiff's remaining discrimination claim only.

Title VII prohibits employers from discriminating "against any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  In an employment discrimination case, the question at summary judgment is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action[,]" with "all evidence belong[ing] in a single pile and . . . evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016).  Put another way, "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Board of Trs. Of Cmty. Coll. Dist. No. 508*,

846 F.3d 216, 224 (7th Cir. 2017).[13]

Plaintiff, marshalling her evidence under the *McDonnell Douglas* framework, contends that she has done exactly that. Under this framework, a plaintiff may establish a prima facie case of discrimination by establishing that:

> "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer."

*David*, 846 F.3d at 225 (alteration in original) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765). Once the plaintiff has made this initial showing, the employer must put forth a nondiscriminatory, legitimate reason for the adverse employment action; and if it does so, then the plaintiff must show that the employer's explanation is pretextual. *Id.* (quoting *Andrews*, 743 F.3d at 234).

As an initial matter, there is no dispute that plaintiff, as a black woman, is a member of a protected class. Instead, defendants contend that plaintiff "cannot prove she met her employer's legitimate job expectations, she has not named nor alleged that similarly situated employees outside of one or more protected classes were treated more favorably,

---

[13] The *McDonnell Douglas* framework may still be useful. For example, in *David*, the Seventh Circuit concluded that the plaintiff had not put forward sufficient evidence on her disparate pay claim under Title VII and the ADEA, finding in part because her selected comparators were not comparable (based on job requirements); the court also looked at all the evidence outside the *McDonnell Douglas* paradigm, concluding that there was nothing in the record to support an inference that the decisions of the community college were based on David's race, sex, or age. 846 F.3d at 227-29.

and she cannot overcome Defendants' legitimate non-discriminatory reasons for issuing the letters of reprimand."  (Defs.' Opening Br. (dkt. #29) 13.)  Where a plaintiff puts forward enough evidence to "raise an inference that [her] employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated [white] . . . employees in a more favorable manner)," the disputed factors merge, allowing plaintiff to make her prima facie case.  *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002);[14] *see also Oest v. Ill. Dept. of Corrections*, 240 F.3d 605, 613 n.3 (7th Cir. 2001) ("The district court correctly held that the second prong, meeting the employer's legitimate business expectations, was not necessary to the analysis; the people judging [plaintiff's] performance were the same she accused of discriminating against her.").

The inquiry to determine whether employees are "similarly situated" is "flexible, common-sense, and factual."  *David*, 846 F.3d at 225-26 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).  Typically, a plaintiff must show that her "comparator": "(1) dealt with the same supervisor, (2) w[as] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]."  *Orton-Bell*, 759

---

[14] The Seventh Circuit affirmed summary judgment in *Peele* because the plaintiff failed to show that her poor job performance (the alleged reason for firing her) was pretextual.  Specifically, the Seventh Circuit found the evidence of the plaintiff's worsening job performance to be overwhelming:  she had received nine written evaluations critical of her performance and she did not challenge the accuracy of these criticisms.  288 F.3d at 328.  The court declined to consider earlier, positive evaluations because the plaintiff had changed job titles and responsibilities.  *Id.* at 329.  Finally, the court concluded that she failed to identify similarly situated colleagues outside her protected class who had been treated better.  *Id.* at 330-31.

F.3d at 777 (alteration in original) (quoting *Coleman*, 667 F.3d at 847 (internal quotation marks omitted)); *see also Filar v. Bd. of Educ. of City of Chic.*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("[T]he comparator must . . . be similar enough 'to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable: complaints about discrimination." (alteration in original) (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007))).

Here, plaintiff has identified a few possible comparators: Nancy Butts, Suzanne Oakey, Nancy Stout, Diane Berenz, Sam Reed,[15] Sue Kennedy, and Paulina Gardner. However, a reasonable juror could find none of these individuals to be an appropriate comparator. First, it does not appear that Sam Reed ever shared a supervisor with plaintiff, precluding him as an appropriate comparator. (*See* Behrend Dep. (dkt. #32) 81:1-6 (testifying he had "[i]ndirect[]" supervision over Reed).) As to the other proposed comparators, plaintiff has marshaled sufficient evidence to show that they: (1) were not African American (*see* Boswell Dep. (dkt. #21) 96:25-97 (identifying Gardner as non-African-American); Soletski Dep. (dkt. #30) 41:8-42:15 (identifying Oakey, Butts, Sue Kennedy, Nancy Stout, and Tara Barbosa as white, similarly-situated colleagues of Boswell); *id.* at 46:16-20 (testifying that Berenz was not African American)); (2) reported to the same supervisor(s) (Soletski Dep. Vol. II (dkt. #31) 121:11-122:9 (identifying Oakey, Kennedy, Barbosa, Stout, Lynch, Green, Berenz and Boswell as her subordinates); Behrend Dep. (dkt. #32) 17:5-21 (identifying Gardner and plaintiff as two of the

---

[15] Plaintiff identified "Sam" as someone who could take vacation time at the drop of a hat, instead of needing to submit a written request, three days in advance. From review of the depositions, it appears that his last name is Reed.

employees he supervises); *id.* 79:23-80:19 (identifying Stout, Oakey and Kennedy as financial specialists within the same unit as plaintiff, noting that Gardner was not in that group); Boswell Dep. (dkt. #21) 63:9-10 (identifying Gardner as a financial specialist senior)); and (3) were treated more favorably than plaintiff (*See* Soletski Dep. (dkt. #30) 45:3-12 (agreeing that Boswell was the only employee investigated for work rule violations); *id.* at 43:23-44:2 (testifying that Butts called in late about "half as many times possibly as [Boswell]" but not after her start time); *id.* at 108:22-109:2 (testifying that she did not believe that she required other employees to respond to emails in a professional manner, within one business day); Boswell Dep. (dkt. #21) 92:25-93:9 (testifying that Oakey was "constantly" on her phone without incident); *id.* at 61:8-62:13 (testifying that Gardner can leave her desk to visit her friend without problem, but that Boswell cannot walk away from her desk); *id.* at 96:20-97:14 (testifying that other employees arrive late, leave early, or altogether miss meetings); *id.* at 68:24-69:2 (testifying that check processing and other work were taken away from her and given to Kennedy)).

Yet none of these people have the same or even similar performance issues as Boswell. Instead, the people she identifies each arguably had *some* of the issues addressed by the November 6, 2014 letter, but none have all -- or even most -- of them. In short, the undisputed evidence shows plaintiff was the *only* employee subject to the requirements set out in the letter of instruction and she has been reprimanded twice since -- for tardiness and missing a meeting -- while her white colleagues have not been subjected to these same expectations, but this alone is not enough to give rise to an inference of racial animus. Indeed, Boswell's tardiness issues were at least twice as bad (or at least more numerous)

than the next employee on her list, and no one else had the *combination* of varying performance issues that she did. Without *some* evidence suggesting that all of these concerns were pretextual, there is no basis to find an underlying racial animus was the cause of Boswell being singled out. *See Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) ("Pretext can be shown by "idenif[ying] . . . weakness, implausibilities, inconsistencies, or contradictions in an employer's asserted reason for taking an adverse employment action such a reasonable person could find [it] unworthy of credence." (alternations in original) (quoting *Coleman*, 667 F.3d 852-53)).

Even if plaintiff's limited showing could give rise to an inference of racial animus, she had not shown an adverse employment action on these facts. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (explaining that "[a]n adverse employment action must be materially adverse" and "significantly alter[] the terms and conditions of the employee's job") (internal citations omitted) (affirming grant of summary judgment in age discrimination suit because plaintiff had "suffered no materially adverse employment action"); *Oest*, 240 F.3d at 613 (concluding negative performance evaluations, and oral and written reprimands alone were not actionable adverse employment actions), *overruled on other grounds by Ortiz*, 834 F.3d at 765. Likewise, "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *See Grube v. Lau Inds., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (internal citations omitted) (affirming summary judgment in sex discrimination suit because plaintiff had not suffered an adverse employment action and could not establish constructive discharge).

At most, Boswell refers to a minor change in job responsibilities and lack of merit-based pay raises, but she neither shows that the change in her role as to check verifications was material nor that merit-based raises were the common practice (much less due someone with mediocre job performance). *See O'Neal v. City of Chi.*, 392 F.3d 909, 911-12 (7th Cir. 2004) ("A transfer involving no reduction in pay and no more than a minor change in working conditions will not [constitute a materially adverse employment action]." (quoting *Hermreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002)); *Smith v. Sibelius*, 09 C 7280, 2011 WL 3704146, at *6 (N.D. Ill. Aug. 17, 2011) (holding that transfer of one responsibility was not actionable because that transfer caused no adverse effect), *aff'd sub nom. Smith v. Sebelius*, 484 Fed. App'x 38 (7th Cir. 2012). Having presented insufficient evidence from which a reasonable jury could conclude that she had been discriminated against based on her race, defendants' motion for summary judgment will be granted.[16]

---

[16] As the court noted above, while defendants sought summary judgment on "all claims," plaintiff offered no argument in support of her hostile work environment claim in her summary judgment opposition. A plaintiff must establish four elements to avoid summary judgment on a hostile work environment claim: "(1) the work environment must have been both subjectively and objectively offensive; (2) her [race] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell*, 759 F.3d at 773 (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)). Even if plaintiff could show that her race was a motivating factor, it is unlikely that a reasonable jury would find her work environment objectively offensive, as she only complains about increased supervision, two letters of expectations and two letters of reprimand, and she does not challenge the factual bases for these letters beyond pointing out isolated issues of some of her colleagues. *See Congleton v. Oneida Cty*, No. 16-cv-412-wmc, 2017 WL 4621117, at * (W.D. Wis. Oct. 13, 2017) ("[c]ourts look to several factors to determine whether alleged harassment is objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance" (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007))).

ORDER

IT IS ORDERED that defendant's motion for summary judgment (dkt. #22) is

GRANTED.  The clerk of court shall enter judgment for defendants and close the case.

Entered this 11th day of December, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge